With the attorneys who are going to make a presentation today, please step forward and please state your name and the party you represent. Anthony Toney on behalf of the President and the public. Walter Jones, Jr. on behalf of the Plano family. Each side will have 30 minutes. You can divide it in half and you can reserve rebuttal if you'd like. 30 minutes total. 30 minutes total. Divided in half. Divided in half. Good morning, Justices. Mr. Justice Taylor, Mr. Justice House, Mr. Justice Palmer. As stated, my name is Anthony Toney. I represent the defendant, Pellanty. We are here in our appeal of three orders entered by the Circuit Court of Cook County on December 17, 2009, July 7, 2010, and May 5, 2011. On December 17, 2009, the Circuit Court granted summary judgment in favor of the plaintiff and against the defendant on the contract count of the complaint and denied summary judgment to the plaintiff on the negligent misrepresentation count. A motion for reconsideration of that order was presented to the Court on July 7, 2010. The motion for reconsideration was denied and a later hearing was held with respect to damages. And on May 5, 2011, the Court entered a judgment in the sum of $572,973.18. The issue that we bring to the Court this morning in our appeal and is set forth in our briefs has to do with the question of whether or not the Court should have considered extrinsic evidence in determining whether the contract was ambiguous. And the Court refused to hear extrinsic evidence in this case and followed the four corners rule, which basically says that if a contract is on space, clear, and unambiguous, then the Court will interpret the contract pursuant to the language of the contract and will not entertain any extrinsic evidence or parole evidence. On the other hand, if a contract is spatially ambiguous, the Court hears parole evidence as to the terms and the issues that led to the formation of the contract to determine whether or not the contract is ambiguous. And lastly, in the case where there – well, the second case has to do with integration clause. If there is no integration clause, then the Court can hear and provisionally admit extrinsic evidence as to the terms of the contract and the negotiations that led to the execution of the agreement to determine the terms and condition and enforceability of the contract. Well, the provisional admissibility of the evidence is so that extrinsic evidence can be admitted to determine if something was ambiguous. Correct. It doesn't just open up everything to an examination of what the intent of the parties were. My question to you is, if you think that the trial court was in error by not provisionally admitting certain evidence, extrinsic evidence, to show an ambiguity, what is the ambiguity? What is it that you say is ambiguous about these warranties? Well, the first instance – And what extrinsic evidence goes to that, I guess you should ask. Okay. In the agreement for the agent's warranties, it states, in connection with the policy scheduled on page 1, the agent represents and warrants to Cannonwell its successors and to signs that. If you look at page 1, there is no policy number. The policy number is left blank. The name of the insurer is Security Financial Life Insurance Company, and it describes the policy as a liability policy with a term of 60 months. Everything in this case had to do with the procurement and financing of a life insurance policy on the employees of the city of Linden, New Jersey. This was not a liability policy. What about the warranties, though? I mean, the policy number and the fact that they made a mistake as to how to characterize the policy, I'm not sure is material in this case. What's ambiguous about the warranties? The warranties go to the procurement and financing of a liability policy. The situation between a liability policy and a life policy is different. And in a life policy, there is no policy until the premium is paid. In this case, if you look at warranty number 9. But it's not just a typo. I mean, everybody understood they weren't doing that type of liability policy. Everybody knew that. It's just a typo. It's not ambiguous. There is no policy. There's no policy number. There's no policy number. There's no policy enforced. The warranties state that the agent warns that the policy is enforced at the time of the execution of the document. There was no policy enforced. And the ambiguity, Ellison Duell, the underwriter at Cannon Will, testified that she knew there was no policy enforced. And you knew there was no policy. Pardon me? And your client knew there was no policy either. Correct. So they didn't rely on that part of it. Well, they also knew that the agent was not collecting any deposit premium. Ellison Duell knew that TJ Adams was not collecting that premium. They knew that Mr. Dombrowski was collecting that premium. So the warranty that we've collected, the agent has collected the deposit premium, is meaningless. But Cannon Will says Dombrowski was your agent. Cannon Will says Dombrowski was your agent. That's all there is in this record as to that issue. It's not put in the complaint. There is no allegation in the complaint that Dombrowski is the agent of TJ Adams and that TJ Adams is vicariously liable for the conduct of Dombrowski. And we dispute that, that Dombrowski was not our agent. Dombrowski was an individual who introduced the city of Linden opportunity to TJ Adams and to Cannon Will. Thereafter, TJ Adams stepped back. Cannon Will and Dombrowski, through Ellison Duell, negotiated the deal thereafter. And all of the documents that were submitted were submitted directly from Dombrowski to Cannon Will, not through TJ Adams. And he provided everything that they requested. And at the end, when he dropped the bombshell, as people referred to it, and stated that the premiums had to come to the insurance company through the insurer, the vice president of Cannon Will stated, there's no flipping way we're going to do that. That's not going to happen. Then they get a letter from Wachovia, dated May 17th, I believe, stating that the funds upon receipt will be immediately wire-transferred to Security Financial Life. And we know that the funds upon receipt did not get wire-transferred to Security Financial Life. The funds upon receipt then were subject to a request by Mr. Dombrowski for $1,190,000 of funds that he then used to make investments, purchase automobiles, and pay Mr. Lock-Cotrando. If I've mispronounced his name, I apologize. The fact of the matter is that there is nothing in these agents' warranties assumed from him. Everything in the agents' warranties happened. Policy was in force. The down payment had been collected. All the things set forth in here had happened. And the funding still went through Wachovia. The warranties or breach of these warranties was not the cause of the loss. And we raised that in our brief as to the question of foreseeability. When you enter into this contract, the foreseeability, the damages that are foreseeable by a possible breach are that this deal is going to fail. If the city of Linden doesn't make its monthly installment payments, the deal fails, and the profits that are anticipated are not going to be recovered or realized. Those are the types of damages that are foreseeable. that Mr. Dombrowski is going to engage in wire fraud and divert funds that are intended for an insurance policy to his own personal use is certainly not foreseeable at the time you're entering into this contract. Mr. Dombrowski diverted the funds to his own use and thereafter was prosecuted by the United States, entered a guilty plea to wire fraud, and is now serving a two-year sentence in a federal penitentiary in Georgia, and is subject to an order of restitution that he is to pay $933,000 to Cannonwell. The reason he's subject to that is because it's his conduct that caused the loss. It's his conduct that caused Cannonwell not to have all of its funds available when it was discovered that there was no policy. It is his fraud and his misconduct that caused the loss here, not the breach of any of the agent's warranties. Well, it seems to me that this argument that you make concerning ambiguity is really, I understand your point, but I think it's the wrong argument. Ambiguity means, in the law, ambiguity in the contract setting means that there's more than one interpretation of a contract clause. You're not saying that there's more than one interpretation of these warranties. You're just saying they're false and that they knew they were false. That's not ambiguity. That's just that there wasn't a meeting of the minds as to these clauses because everybody knew they're false and that they were put in the policy because it's the form for the wrong type of policy. That's not ambiguity. That's just that they're false. I think my interpretation of the ambiguity is that they're inapplicable to the policy that's scheduled on the front page. That's not ambiguity. Ambiguity means there's two interpretations of the same word or clause. That's ambiguity. What you're saying is they're false because they're for a liability policy. They're not for a life policy. And they knew that. And, therefore, since they knew that, this is not something that caused their damage. So putting that aside, because you did also make that argument, my question, well, let me point to what I thought was an interesting line in their brief. In their brief, they say, the warranties in the finance agreement establish the legitimacy of the transaction. Very important line in their brief, I believe. Because what I take from that is what they're saying is here's why this caused us the loss. We would not have come forward with our 15 had we not known that Lansing came forward with their 6. And the reason they would say that is we're not coming in with our money unless we know this is a real deal. That's how we protect against the kind of fraud that Dombrowski perpetrated, because the warranties let us know that there's an actual deal here and that some guys are just grabbing our money. So I would say how do you answer that line in their brief? And Mr. Jones will tell me if I interpreted it wrongly, but that's the way I see it. The question is they would not have funded the loan if they had known that the deposit premium was not collected. It's contradicted by their own underwriting officer, Alison Duell, who said that she knew that the money was not being collected by T.J. Adams. And the fact of the matter is if you read through – But does it say that? I mean, you said she knew it wasn't being collected by T.J. Adams. But didn't she know it was being collected by Dombrowski? That's what she – her belief was it was being collected by Dombrowski. I think that they think that when it's collected by Dombrowski, it's collected by T.J. Adams. I mean, I don't know if the warranty makes a distinction that you just made. What I'm seeing them say is, you know, we were told that Lansing had come up with the six, and that's why we came up with the 15. Okay. And I believe that they were not told that the six had been paid and that Alison Duell was aware of that at the time of the transaction. I would further point out to the court, to the panel, that Mr. Spader, the vice president of Cannonwell – or excuse me, the general counsel of Cannonwell stated that if everything else was in order and perfect form, absent the letter from Wachovia, they would never have released the funds and that you could have the agent's warranties and all of the set-off agreements, everything in the underwritten file, properly packaged, executed and signed, and but for the Wachovia letter agreement, he would never have released the funds. And that's the triggering mechanism because this was a deal outside of the norm. No one had ever done a life deal to completion before to a signed agreement. And we have, then, the intervening action of Mr. Dombrowski. And maybe they won't again, huh? I doubt that they will. And if they did, they would probably use different forms. But the reality is that the intervening conduct, the unforeseen conduct of Wachovia breaching its agreement and Dombrowski committing a crime is unforeseen at the time this agreement was entered into. And the subsequent prosecution and conviction of Mr. Dombrowski goes to show where the fault lies. I also want to point out, just briefly, that when this all came down, within 30 days of the discovery, all but $765,000 of the assets had been recovered. Cannonville went out to Georgia and sued Wachovia and sued Mr. Dombrowski. And they did not raise in those pleadings any action against T.J. Adams. They did not join T.J. Adams in that action. And the conduct of T.J. Adams was not set forth as the cause of the damages. They were sued for their conduct, for which Mr. Dombrowski entered a consent judgment for the $765,000 and Wachovia paid $500,000 to Cannonville for its misconduct and breach. And I would suggest to the court that therein lies the problem with Cannonville's position and with the circuit court order entering judgment in their favor. I would further suggest to the court that the award of attorney's fees for the Georgia litigation is not related to the warranties or breach of warranties by T.J. Adams and that, at a minimum, that portion of the judgment should be set aside. But if they didn't, the fact that they received $500,000 from the Georgia litigation also helped you because they're looking for less money from you. Of course. So this is what was related. Or connected. Or connected. So you're using that connected arising from, but I don't believe the conduct that took place in Georgia was separate and apart from this transaction. The conduct that took place in Georgia was criminal conduct on the part of Dombrowski and a breach of agreement by Wachovia Bank of its independent agreement. And I have 15 minutes or so. Thank you. Counsel. May it please the Court. Once again, Walter Jones on behalf of the plaintiff's athlete. I want to go directly to what Justice Palmer had to say. Justice, you read our brief exactly, but you only missed one point. There were two things. When we received these warranties, and I might say that these warranties also say that there is no legal defense. Once you breach these warranties, the warranties say to themselves, there's no defense to that. We put up $15 million. As everybody knew, it was crucial to us to know that this was a legitimate deal, that this was a legitimate contract going forward. The second part of that, we never would have sent out a dime of the $15 million if we knew that there wasn't any contract, that there wasn't any life insurance contract. Now, these folks knew that it was crucial to us for the life insurance contract, because the record shows you they brought us security, as in the record, asked us, then we asked them, why did you choose security? They told us the reason we chose security is because they're an A-plus entity. So they knew that our whole $15 million would have never gone into play if these things hadn't been done. Then they come back, despite the clear, unambiguous nature of the warranties, and say, oh, there must have been some intervening act by Mr. Droboski. Now, let me just tell you what mixes that whole thing. There's no separation here with Mr. Droboski. Before we go to that intervening act argument, what about their position that notwithstanding the warranty the issuance of the policy, that the deposition testimony establishes that your clients knew that that policy had not been issued, because the premium, it was a chicken-and-the-egg thing. And then they're taking the position that we wouldn't have issued the policy before the premium came in, because that's really language for liability policy.  All right. And I'll tell you this, Judge, and I think that that's why you have contracts, and that's why you have two very sophisticated parties here that both had lawyers. And, you know, they had this contract for seven days before they executed it. He wants to take the testimony some pre-signing of the contract from one of the people that was involved. But the key is here, once parties, sophisticated parties, sign a contract, this is what we believe. Once that was executed by their CFO, we took this to be true. We don't lay out $15 million on any quill where somebody might believe. We put out $15 million because we believe the warranties that they had signed. Now, I might say this, that his argument is that somehow this is ambiguous, that this must have been for some liability party, this must have been for something. As you see in the record, when I deposed their CFO, I went right to the heart of this. I said, Mr. Houlihan, you knew when you signed this contract, sir, that this contract was for a life insurance policy for the city of London. You didn't think that this was for any liability party. He said, yes, sir, that's true. And you notice that they never addressed that in their roots. So what we have here is that we have clear warranties that are unambiguous. We have them coming in saying, well, you know, this intervening with Mr. Drombowski, I want you to know that the circuit court here found in the record that he was their agent and that there is no break here at all. You know, the record shows that we were introduced to Drombowski because they wanted to get into this whole life insurance thing. We had tried to do one deal before. Do you know the record also shows that they provided information to us about his credentials and his resume so that it would appeal to us. One thing I want you to look at the record very quickly is when they sent something out and they said, now look, his CV should be sure to include the time he spent with Agon. We're all Agon people. We are in an ex-club with Agon but still hold Agon as a company in high regard. If Ed worked for a number of years for Agon Consulting, that will play well with Cannon Wheel. And that's exactly what they said. They together jointly provided us information, as you can see in the records we provided you, that the carrier that had been selected was A+. That was done jointly with Adams and Drombowski. They provided the documentation that they needed. We see from the records that Adams was to receive a portion of the broker's commission along with Drombowski. They were co-producers of this deal. They also knew that we demanded that their names appear on the agreements as either agents or co-brokers. And I also want to point out to you that it was Drombowski who presented the Wachovia letter. Now all of these things take place in a matter of days. There is no causal break here. All of this was clearly foreseeable because this man was, as the judge found, he was their agent. And along with the warranties, they were clearly liable. I want to say just a moment about this whole thing about the parole evidence. I think that this court is directly on board. What they want to try and do is proffer evidence to make something ambiguous that's clearly unambiguous. That they would take because of their just two tiny little mislabels on the thing about the liability policy and what they say is an incorrect number of the policy. I may add to you that the warranties that they signed said that everything on this policy is great, that there's nothing wrong with this policy, that this policy, we are the brokering agent of security. So that's what they warranted us about. I might say to you today that even the cases that they present, all the cases they present, no provisional evidence was allowed in any of those cases. If ever there was a case of the application of the four quarters rule, this is the case. And when they say to you, well, you know, justices, we went out there and we tried to help collect the money. I don't think you would try to help collect the money after you had signed these warranties. And it's saying that all these things you knew, you were in the rigor that the best thing that ever happened to them is that we were able to go out there quickly, try to collect that money. It saved them from a much bigger tragedy than that they now suffer in this case. And I will also say to you, they are part of the integration cause in this case, because even what they sign on the front page, they don't just sign on the front page and say, well, you know, the only thing that we're responsible for are the warranties. They also sign, which is right next to it on the front page, they also say, and we agreed to be bound by the terms of this agreement. So they are clear in this from head to toe. I think that the judge's decision in this case, after hearing tons of argument, tons of evidence, was directly on point, the way she read the warranties, the way that she handled the parole evidence, the way she clearly saw that this whole thing was once you let that $15 million out, it was foreseeable, especially with Brombowski being their agent. So, Justice, what we would ask you, obviously, is to affirm the decision of the circuit court. So how were you damaged by the violation of those two warranties? And two, was that foreseeable? Yes. Let me tell you how this is foreseeable, because if you even take a look at the first part. Let me get right to it. Gary, this is how we're damaged by your breach of the warrant. When you put $15 million into play, there are a lot of things that can happen that are bad, that we're damaged because we never would have put the $15 million into play. Let me give you a great example of this tort case on intervening costs. The Baja case where the bank gives, they know that a man is mentally retarded, and they give him millions of dollars, and he goes out into the street, and somebody kills him and tries to take the money. And this court held, well, yeah, once you put that kind of money in play, you're responsible for the bad things that could have happened. And we cite several cases like that. We're damaged because we would not have put that money in play. That money would have stayed safe with us. And it's their agent that goes out and causes all this trouble. And the guy they introduced to us, the guy who was their co-broker, their co-producer. Any other questions? Well, they say, I don't know if you would say this is a splitting of hairs or what, but they say that with regard to the warranty that the number nine, paragraph nine, the cash down payment and any installments due from the insured, which the agents agreed to collect had been collected, that they say that you knew that they hadn't gotten that money. Well, let me say this to you. That's why we signed contracts. You know, I could have all the conversations with people in the world prior to the time I signed a contract. And mind you, this is a contract between very sophisticated people. This isn't a contract between Joe and Jane out on the street. This is a contract with people who do millions of dollars worth of business. And they understood, as Mr. Hooligan, their CFO, said, when he executed this contract and had six days to look it over, that's where you really get into it. Forget about what you might have said prior to this time. We've got to go with the four corners of the contract. And this contract, this is what they agreed to with those warranties. This is what it's all about once you've signed a contract. Any further questions? Thank you. Mr. Taney, any questions? Mr. Palmer, in regard to the question you asked of Mr. Jones, in our reply brief, we stated that the conclusions of Cannon will leave unanswered the hows and the whys of foreseeability. Such as, in the absence of an unforeseeable breach of contract by Wachovia and a theft by Dombrowski, how did the failure to collect the premium down payment leave the loan unprotected? Or why would the affirmance of the policy's existence have stopped Wachovia from improperly releasing the funds to Dombrowski? Judge McGrath in the motion for reconsideration, which was only on the contract issue, stated that she believed that there was a question of fact as to intervening cause in this case, but believed that the warranties were so broad that they overrode the intervening cause. And I suggest to you that the intervening cause was unforeseeable at the time of entering the contract. I'd also like to point out that at paragraph 13, it states, the integration clause, this agreement constitutes the entire agreement between Cannon will and insured, and may not be modified except as agreed upon in writing. This is not an agreement, this integration clause does not apply to T.J. Adams, it's between the lender and the insured for the finance premium. I would also like to point out that I believe there's been no legal finding of the issue of agency with regard to Dombrowski. It's a statement in an argument that is stated in an argument and is stated in an argument. It's never been part of a pleading. Even if Dombrowski was perceived to be our agent, how in the world, in what world, is committing water fraud for which he's going to jail and has disorder of restitution be within the scope of any possible agency? It just, it does not exist under those circumstances. I do not believe that the damages that are been awarded by the trial court are related to this contract, these warranties, and we are only part of the warranties, we are not parties to the contract. The only, the provision where we sign says that we are signing these warranties as the agent, and that we are not part of the contract, so there is no integration clause. There's no integration clause for all of this is permissible. And Alison Dool testifies that she herself contracted security financial life insurance before the funding and was told that the policy was ready to go. Obviously, they needed the money. But she did her own independent investigation into these issues and confirmed for herself and said, I didn't take Dombrowski at his word even once. I independently confirmed everything on my own. And the final piece that allowed the funding was the Wachovia letter. Your Honor, thank you very much. Thank you. All right, this case will be taken under advisement and an opinion issued in due course. It was well briefed and well argued. Thank you very much. Thank you, Judge.